# UNITED STATES DISTRICT COURT

For the

SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| | ) |
| | ) |
| | ) |
| | ) |
| DR. RANDY ZAPATA | ) |
| ———————————————— | |
| *Plaintiff(s)* | ) |
| | ) |
| v. | ) |
| | |
| | ) |
| | |
| <u>Florida Division of Elections</u>, Room 316, | ) |
| | |
| R.A. Gray Building, 500 South Bronough Street | ) |
| | |
| Tallahassee, Fl. 32399-0250, 850.245.6200 | ) |
| | |
| & | ) |
| | |
| CURRENT GOVERNOR RON DESANTISS | ) |
| | |
| & | ) |
| | |
| CANDIDATE CHARLIE CRIST | ) |
| | |
| & | ) |
| | |
| CANDIDATE NIKKI FRIED | ) |
| | |
| ———————————————— | |
| | |
| *Defendant(s)* | ) |

**MOTION FOR A STAY PENDING APPEAL**

**MOTION FOR A STAY PENDING APPEAL**

To: FLORIDA DIVISION OF ELECIONS, R. A. GRAY BUILDING, ROOM 316, 500 SOUTH BRONOUGH STREET, TALLAHASSEE, FLORIDA 32399-0250

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

During the course of this lawsuit Comes now This Motion For A Stay Pending Of Appeal of The Governors Elections scheduled to officially complete on November 08, 2022 and currently its preliminary mail-in voting process, Defendant in the above-captioned cause, and respectfully that this Court grant a Stay of this Court's Order dated _____ (dated) pending review of that Order.  As explained in more detail in the accompanying Memorandum of Authorities, a Stay is appropriate because (i) Defendant's appeal will present serious legal questions; and (ii) absent a stay defendant will suffer irreparable injury.

In the alternative, in the event the Court denies this Motion, Defendant respectfully requests that the date of compliance with the court's _____ (date0 Order, if necessary.  Defendant therefore respectfully requests an extension of the _____ (date) dead to a date two weeks past the later of (a) the date of any order of this Court denying Defendant's Motion for a Stay over the Elections of this Court's _____ (date) Order; or (b) the date of any order of the Court of Appeals denying any motion for a Stay of this Court's _____ (date) Order.

Respectfully Submitted

Dr. Randy Zapata, Prose/PA, JD

*CLERK OF COURT*

Date: _____

_____
                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## CERTIFICATE OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* <u>Florida Division of Elections, Room 316, R.A. Gray Building, 500 South Bronough Street, Tallahassee, Fl. 32399-0250, 850.245.6200; CURRENT GOVERNOR RON DESANTISS; & CANDIDATE CHARLIE CRIST; & CANDIDATE NIKKI FRIED</u> was received by me on

*(date)* _____ .

' I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____  _____ ; or

' I left the summons at the individual's residence or usual place
of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

' I served the summons on *(name of individual)* _____ , who is _____

_____  on *(date)* _____  _____ ; or

⌐ I returned the summons unexecuted because _____ ; or

⌐ Other *(Specify):*
designated by law to accept service of process on behalf of *(name of organization)*
I UPLOADED VIA EMAIL <u>DivElection@dos.myflorida.com</u> and served it via certified signed return receipt.
Certified Number: <u>7021 0950 0000 0374 7665</u>; U S Federal Court certified number: <u>7021 0950 0000 0374 7672</u>

My fees are $ for travel and $ for services, for a total of $

██████████     ████████         ████████████

I declare under penalty of perjury that this information is true.

Date: _____     _____
                          *Server's signature*

                          DR. RAWLY ZAPATA, PROSE/PA, JD
                          *Printed name and title*

                          6905 NW 173rd DR. STE. 0.205, Hialeah,
                          *Server's address*
                          FLA. 33015

Additional information regarding attempted service, etc.

## NOTICE OF MOTION FOR STAY PENDING APPEAL

      You are notified that on _____ (date), at _____ (time), or as soon thereafter as counsel can be heard, in Courtroom _____ of the _____ Court for_____ County, _____ (State). at the _____ (County) Courthouse at

_____

_____ (street address, city, county, state, zip code).  Defendant <u>Dr. Randy Zapata, prose/PA, JD,</u> by and through his Prose/Pa, will bring on for hearing his **MOTION FOR STAY PENDING APPEAL** for the reasons stated in the above Motion.

Respectfully Submitted

_____

Dr. Randy Zapata, Prose/PA, JD

Florida Department of State

Division of Elections

R. A. Gray Building, Suite 316

800 South Bronough Street

Tallahassee, Florida 32399

Dr. Randy Zapata

6905 M W 173rd Drive

Ste; O205

Hialeah, Florida 33015

Dear Ms. Donna S. Brown, Chief Bureau of Elections Records

I am currently writing to you in regards to the attached letter that I have received In the las6 couple of days.  I am attaching a copy of your letter in order to make sure that we are on the same page.  It is dated June 28th, 2022 and I wish to inquire where do you get notion that I am considering to terminate my candidate and why have you offered this notion to me?  When all documents in particular in regards to my Campaign Treasurer has been updated as required have been resolved and on time.   I expect your office to correct this issue and share this correction with everyone and in particular for example the Brevard Democratic Party in Melbourne Florida attention Ms. Pamela Castellana.  I will appreciate this expedient transmitted.  Otherwise, I will be forced to file a Federal case against the Elections Divosion.

I will wait for your response within 16 days in accordance to the Federal Statutes of Limitations.

Thank you

Dr. Randy Zapata

CERTIFIED NUMBER :

70 21 0950 0000 0374 7658

1



# FLORIDA DEPARTMENT of STATE

**RON DESANTIS**
Governor

**CORD BYRD**
Secretary of State

## MEMORANDUM

**TO:**    Candidates Who Did Not Qualify

**FROM:**    Donna S. Brown, Chief
Bureau of Election Records

**DATE:**    June 28, 2022

**SUBJECT:**    Closing Out Your Campaign Account and Filing Your Termination Report

---

Candidates who did not qualify must, within 90 days, dispose of all funds on deposit in the campaign account.  Therefore, your termination report (TR) must be filed using the Electronic Filing System (EFS) no later than **September 15, 2022.**  You are not required to close the campaign prior to the due date; however, you must have written checks disposing of all surplus funds by this date.  You may file your report at any time prior to the deadline once you have disposed of all funds.  <u>In order to file your termination report prior to the deadline, you will need to change the coverage period, which has been defaulted to an ending period of September 15, 2022, in the EFS</u> (*see* attached example).

If you submitted petitions to a supervisor of elections and did not pay to have signatures verified because you filed an undue burden oath, you must reimburse the county for verifying the signatures pursuant to Section 106.141(7), Florida Statutes.  Please contact any supervisor of elections that verified signatures for your campaign to determine the amount that must be reimbursed.

If you have any questions, or if we may be of assistance to you at any time, please contact this office at (850) 245-6280.

DSB/mcc

Attachment



**If you file your Termination Report __PRIOR__ to September 15, 2022, change the coverage period __end date__ in the EFS to the date you are filing your report.**

Use this form to submit an original report. To submit an amendment to a previously filed report, first select the report from the 'Filed Reports' listing and then choose the 'Amend Report' option from the 'Filings' menu item.

**Coverage Periods**

Campaign finance reports itemize financial activity occurring during a sp... is declared by first selecting the election cycle then the report type & yea... s and the filing due date of the report are automatically associated with the selec...

CHANGE THE END DATE HERE TO THE DATE YOU ARE FILING YOUR TR REPORT

Election Cycle: 2020 Election

Report Type & Year: TR 2020

Coverage Period: 6/13/2020   9/10/2020   Due Date: 09/10/2020

Special Election Report   ☐ Waiver



# FLORIDA DEPARTMENT *of* STATE

**RON DESANTIS**
Governor

**CORD BYRD**
Secretary of State

## MEMORANDUM

**TO:**       Candidates and Campaign Treasurers

**FROM:**   Donna S. Brown, Chief
Bureau of Election Records

**DATE:**    May 17, 2022

**SUBJECT:**   Termination Reports

Please review the following information to assist you in properly filing your termination report.

### THINGS TO REMEMBER

- Once a candidate is elected, eliminated, fails to qualify, becomes unopposed, or withdraws, the funds in the campaign account must be disposed of as set forth in 106.141, F.S.

- Candidates must dispose of all funds on deposit in the campaign account within 90 days of the triggering event.  **The due date of the termination report will be reflected in the Electronic Filing System (EFS).**

- You are not required to close the campaign account prior to the due date; however, you must have written checks disposing of all surplus funds by this date.

- You may file your report at any time prior to the deadline once you have disposed of all funds.  To do this, the Report End date in the EFS must be changed to the date the report is filed.

| Report 2015-TR-28    2014 General Election | | Covers: 10/31/2014-2/2/2015 | Due: 2/2/2015 |
|---|---|---|---|
| ☐Amendment  ☐Waiver | Complete Status: Incomplete Detail Records | | Start Date: 10/31/2014 |
| File Date: | Review Status: Not Reviewed | | End Date: 2/2/2015 |
| Status: Data Entry | Last Review: | | |



**Uncashed Pro-rata Refund Checks**

Many times when pro-rata refunds are issued to contributors, the checks are not cashed.  If this occurs, contact the person and ask them to please cash the check so that the campaign can be finalized.  If the check is never cashed, the money will need to be redistributed.

- Create a new expenditure entry using a **negative amount** with the expenditure type **DIS**.  In the purpose field, indicate that it was an uncashed pro-rata refund.

- When the funds are redistributed, create a new expenditure (positive amount) with the date the funds are redistributed, using the expenditure type **DIS**.

**Expense Refunds**

Campaigns routinely receive refunds after the election for such things as sign deposits, unused funds for advertising, utility security deposit refunds, etc.  If this occurs, create a **negative expenditure** sequence and use the expenditure code **REF**.

- If the refund is received after the termination report is filed, an amended termination report must be filed showing the refund and subsequent disposition.

- If the refund is received after the termination report is filed and the campaign account is closed, the candidate may endorse the check and distribute as surplus funds.  An amended termination report must be filed showing the refund and subsequent disposition.

**Petty Cash**

Unused petty cash that is deposited back into the campaign account so that it may be distributed as surplus funds is recorded as a **negative expenditure** and coded as **PCW**.

It is important that the petty cash activity throughout the campaign balances.  If you need assistance determining that your petty cash activity balances, you may send an email to efs@dos.myflorida.com and request a "Petty Cash" report.

**Balanced Totals – Monetary Contributions vs. Expenditures**

Once you are finished distributing surplus funds, your totals must balance.  The amount of monetary contributions received must equal the amount of expenditures.  If you need assistance with determining whether your totals balance, you may send an email to efs@dos.myflorida.com and request a "Sum of Contributions vs. Expenditure" report.

If you have any questions, please contact this office at 850-245-6280.

- Roll-over funds (applies only to state candidates who were elected) – transfer up to $20,000 to a *future campaign* for the **same office**.
    - "State" *candidate includes a candidate* for Governor, Cabinet, Supreme Court, District Court of Appeal, legislative offices, state attorney, public defender, and circuit court judge.
    - With respect to legislative office, "same office" means an office in the same legislative body, irrespective of district number.
    - With respect to public defender, state attorney and circuit court judge, "same office" means the same circuit, group, seat, etc., as applicable.

## EFS REPORTING

**Expenditure Codes**

> *Important:  You must use the following Expenditure Type Codes:*

- **DIS** – Repayment of funds to candidates, donation to charitable organization, pro-rata *refunds to contributors*, funds given to the General Revenue fund.
    - Do not report using the expenditure type REM or report in the Other Distribution section.
- **DFC** – (Roll-over funds) transfer to a future campaign for the **same office**.
- **DPP** – Funds given to an affiliated party committee or political party.
- **DPV** – funds used to reimburse a supervisor of elections for petition fees after campaign is over.
- **TOA** – Funds transferred to an office account.
    - ***Important:***  *The amount shown in the termination report as being transferred must match the amount being reported as deposited in the office account report.*
- **MON** – for all other expenditures.

## Contributions Received after the Deadline

- *If the contribution is deposited*, report the contribution on the date received.  Create a separate contribution entry for the date of the return and report the amount as a negative using the contribution type **REF**.
- *If the contribution is received after the deadline and returned without being deposited*, do not report it on the termination report.  Fill out form DSDE-2 and file with the Division of Elections.

## DISPOSING OF FUNDS

*Sections 106.11(5) and 106.141, Florida Statutes*

**Required:**

- Pay for items which were obligated before the candidate was elected, eliminated, became unopposed or withdrew.
- Pay for expenditures necessary to close down the campaign office and prepare the final campaign reports.
- Reimburse any supervisor of elections for waived signature verification fees for candidate petitions by virtue of having filed an Affidavit of Undue Burden.

**Optional**

*(one or any combination thereof):*

- Reimburse the candidate for any reported contributions that he or she made to the campaign. (The candidate may be reimbursed for funds he or she deposited prior to reimbursing a supervisor of elections for waived petition fees.)
  - This includes in-kind contributions and loans.
- Purchase "thank you" advertising for up to 75 days after the candidate was elected, eliminated, became unopposed or withdrew;
- Return pro rata to **each** contributor.
  - All contributors (except the candidate) must receive a portion of their contribution.
  - This includes in-kind contributors.
- Donate the funds to one or more charitable organizations that meet the qualifications of s. 501(c)(3) of the IRS Code.
- Give not more than $25,000 (**in total**) to the affiliated party committee **or** political party of which the candidate is a member.
  - A candidate may **not** give to a political club.
- Give the funds to the State General Revenue Fund.
- Transfer money to an office account (only candidates who were elected) - See *Section 106.141(5), F.S.,* for amounts.

2

JAX FL DSA 54



**FLORIDA DEPARTMENT OF STATE**
**DIVISION OF ELECTIONS**
R.A. Gray Building
500 South Bronough Street, Rm 316
Tallahassee, Florida 32399

Mr. Randy Zapata
6905 Northwest 173rd Drive
W036820278225
Hialeah, FL 33015

DEM    GOV

079    EABRAMB  33015

## REMEDY

## PAIN AND SUFFERRING

a) WHEREFORE, Defendant respectfully requests that this Court grant this Motion, Set For Hearing and award PLAINTIFF costs and attorney's fees Hardship Monetary awards of $300,000.00 for Psychological Distress and $300,000.00 for 'Emotional Distress" and "Traumatic Distress" for $300,000.00.  This is three of five categories and the added two will be submitted later in case.

b) SOCIAL ANXIETY DISORDER (SOCIAL PHOBIA) 300.23(F40.10

c) PANIC DISORDER 300.23(F41.0)

d) SOMATIC SYMPTOM AND RELATED DISORDERS (161)

e) DEPRESSIVE DISORDERS (93)

f) TRAUMA-AND STRESSOR-RELATED DISORDERS, REACTIVE ATTACHMENT DISORDER,  313.89 (F94.1)

# Form 1.922 - SUBPOENA DUCES TECUM WITHOUT DEPOSITION

Form 1.922 - SUBPOENA DUCES TECUM WITHOUT DEPOSITION

**(a) When Witness Has Option to Furnish Records Instead of Attending Deposition; Issuance by Clerk.**

SUBPOENA DUCES TECUM

THE STATE OF FLORIDA:

TO FLORIDA ELECTIONS DEPARTMENT, RON DESANTIS, CHARLIE CRIST AND NIKKI FRIED

YOU ARE COMMANDED to appear at .... in .... Florida, on .....(date)....., at ......(a.m./p.m.), and to have with you at that time and place the following: ....

These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You may comply with this subpoena by providing legible copies of the items to be produced to the attorney whose name appears on this subpoena on or before the scheduled date of production. You may condition the preparation of the copies upon the payment in advance of the reasonable cost of preparation. You may mail or deliver the copies to the attorney whose name appears on this subpoena and thereby eliminate your appearance at the time and place specified above. You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena. THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.

If you fail to:

(1) appear as specified; or

(2) furnish the records instead of appearing as provided above; or

(3) object to this subpoena,

you may be in contempt of court. You are subpoenaed to appear by the following attorney, and unless excused from this subpoena by this attorney or the court, you must respond to this subpoena as directed.

DATED on ................

(Name of Clerk)

As Clerk of the Court

By _____

_____

Attorney for ........................................

Form 1.922 - SUBPOENA DUCES TECUM WITHOUT DEPOSITION

...............................................

...............................................

Address

Florida Bar No. ...................................

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact [identify applicable court personnel by name, address, and telephone number] at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**(b) When Witness Must Appear and Produce the Records; Issuance by Clerk.**

SUBPOENA DUCES TECUM

THE STATE OF FLORIDA:

TO: *Ron DeSantis*

YOU ARE COMMANDED to appear at .......... in .........., Florida, on .....(date)....., at ...... (a.m./p.m.), and to have with you at that time and place the following: ...........

These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena. THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.

If you fail to:

(1) appear or furnish the records at the time and place specified instead of appearing; or

(2) object to this subpoena,

you may be in contempt of court. You are subpoenaed by the attorney whose name appears on this subpoena, and unless excused from this subpoena by the attorney or the court, you must respond to this subpoena as directed.

DATED on ................

(Name of Clerk)

As Clerk of the Court

By _____

As Deputy Clerk

_____

Attorney for ..........................................

Form 1.922 - SUBPOENA DUCES TECUM WITHOUT DEPOSITION

.............................................................

.............................................................

Address

Florida Bar No. ....................................

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact [identify applicable court personnel by name, address, and telephone number] at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**(c) When Witness Has Option to Furnish Records Instead of Attending Deposition; Issuance by Attorney of Record.**

SUBPOENA DUCES TECUM

THE STATE OF FLORIDA:

TO ..*CHARLIE CRIST*

YOU ARE COMMANDED to appear at .......... in .........., Florida, on .....(date)....., at ...... (a.m./p.m.), and to have with you at that time and place the following: ...........

These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You may comply with this subpoena by providing legible copies of the items to be produced to the attorney whose name appears on this subpoena on or before the scheduled date of production. You may condition the preparation of the copies upon the payment in advance of the reasonable cost of preparation. You may mail or deliver the copies to the attorney whose name appears on this subpoena and thereby eliminate your appearance at the time and place specified above. You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena. THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.

If you fail to:

(1) appear as specified; or

(2) furnish the records instead of appearing as provided above; or

(3) object to this subpoena,

you may be in contempt of court. You are subpoenaed to appear by the following attorney, and unless excused from this subpoena by this attorney or the court, you must respond to this subpoena as directed.

DATED on ................

(Name of Attorney)

Form 1.922 - SUBPOENA DUCES TECUM WITHOUT DEPOSITION

For the Court

_____

Attorney for ...........................................

.............................................................

.............................................................

Address

Florida Bar No. .....................................

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact [identify applicable court personnel by name, address, and telephone number] at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**(d) When Witness Must Appear and Produce the Records; Issuance by Attorney of Record.**

THE STATE OF FLORIDA:

TO .. *NIKKI FRICK*

YOU ARE COMMANDED to appear at .......... in .........., Florida, on .....(date)....., at ...... (a.m./p.m.), and to have with you at that time and place the following: ...........

These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena. THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.

If you fail to:

(1) appear or furnish the records at the time and place specified instead of appearing; or

(2) object to this subpoena,

you may be in contempt of court. You are subpoenaed by the attorney whose name appears on this subpoena, and unless excused from this subpoena by the attorney or the court, you must respond to this subpoena as directed.

DATED on ................

(Name of Attorney)

For the Court

_____

Attorney for ..........................................

.............................................................

.............................................................

Address

Florida Bar No. .....................................

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact [identify applicable court personnel by name, address, and telephone number] at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

Amended by 199 So.3d 867, effective 1/1/2017; amended by 131 So.3d 643, effective 1/1/2014; amended by 966 So.2d 943, effective 1/1/2008; amended by 682 So.2d 105, effective 1/1/1997; added by 391 So.2d 165, effective 1/1/1981; added by 211 So.2d 174, effective 10/1/1968.

*NOTE:*

*These forms are to be used for production of documents under rule 1.351. Form (a) is used when the person having the records may furnish copies to the attorney requesting the subpoena instead of appearing at the time and place specified in the subpoena and the subpoena is to be issued by the clerk. Form (b) is used when the records must be produced at the time and place specified in the subpoena and the subpoena is to be issued by the clerk. Form (c) is used when the person having the records may furnish copies to the attorney requesting the subpoena instead of appearing at the time and place specified in the subpoena and the subpoena is to be issued by an attorney of record. Form (d) is used when the records must be produced at the time and place specified in the subpoena and the subpoena is to be issued by an attorney of record.*

*Committee Notes*

*1980 Adoption. This form is new.*

*1996 Amendment. Forms (a) and (b) were amended and forms (c) and (d) were added to comply with amendments to rules 1.351 and 1.410.*

*2013 Amendment. The notice to persons with disabilities was amended to make the procedure for obtaining accommodation consistent with the procedure required in court proceedings.*

 casetext

5

# 14th Amendment - Citizenship Rights, Equal Protection...

**No State shall make or enforce any law** which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## 14th Amendment

The Fourteenth Amendment addresses many aspects of citizenship and the rights of citizens.  The most commonly used -- and frequently litigated -- phrase in the amendment is  "equal protection of the laws", which figures prominently in a wide variety of landmark cases, including Brown v. Board of Education (racial discrimination), Roe v. Wade (reproductive rights),  Bush v. Gore (election recounts), Reed v. Reed (gender discrimination),  and University of California v. Bakke (racial quotas in education).  See more...

## Primary tabs

## Amendment XIV

## Section 1.

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## Section 2.

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

## Section 3.

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

## Section 4.

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

## Section 5.

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

**wex resources**

**Section 1.**

Privileges and Immunities Clause

Civil Rights

Slaughterhouse Cases

**Incorporation**


# <u>Due Process</u>

**Introduction**

The Constitution states only one command twice. The <u>Fifth Amendment</u> says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." The <u>Fourteenth Amendment</u>, ratified in 1868, uses the same eleven words, called the Due Process Clause, to describe a legal obligation of all states. These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures. Most of this essay concerns that promise. We should briefly note, however, three other uses that these words have had in American constitutional law.

The Fifth Amendment's reference to "due process" is only one of many promises of protection the <u>Bill of Rights</u> gives citizens against the federal government. Originally these promises had no application at all against the states (see *<u>Barron v City of Baltimore</u>* (1833)). However, this attitude faded in *<u>Chicago, Burlington & Quincy Railroad Company v. City of Chicago</u>* <u>(1897),</u> when the court incorporated the Fifth Amendment's Takings Clause. In the middle of the Twentieth Century, a series of Supreme Court decisions found that the Due Process Clause "incorporated" most of the important elements of the Bill of Rights and made them applicable to the states. If a Bill of Rights guarantee is "incorporated" in the "due process" requirement of the Fourteenth Amendment, state and federal obligations are exactly the same.

## Substantive due process

The words "due process" suggest a concern with procedure rather than substance, and that is how many--such as Justice Clarence Thomas, <u>who wrote "the Fourteenth Amendment's Due Process Clause is not a secret repository of substantive guarantees against unfairness"</u>--understand the Due Process Clause. However, others believe that the Due Process Clause does include protections of substantive due process--such as Justice Stephen J. Field, who, in a dissenting opinion to the <u>Slaughterhouse Cases</u> wrote that <u>"the Due Process Clause protected individuals from state legislation that infringed upon their "privileges and immunities" under the federal Constitution. Field's dissenting opinion is often seen as an important step toward the modern doctrine of substantive due process, a theory that the Court has developed to defend rights that are not mentioned in the Constitution."</u>

Substantive due process has been interpreted to include things such as the right to work in an ordinary kind of job, marry, and to raise one's children as a parent. In *<u>Lochner v New York</u>* (1905), the Supreme Court found unconstitutional a New York law regulating the working hours of bakers, ruling that the public benefit of the law was not enough to justify the substantive due process right of the bakers to work under their own terms. Substantive due process is still invoked in cases today, but not without criticism (See this <u>Stanford Law Review article</u> to see substantive due process as applied to contemporary issues).

## The promise of legality and fair procedure

Historically, the clause reflects the <u>Magna Carta</u> of Great Britain, King John's thirteenth century promise to his noblemen that he would act only in accordance with law ("legality") and that all would receive the ordinary processes (procedures) of law. It also echoes Great Britain's

Seventeenth Century struggles for political and legal regularity, and the American colonies' strong insistence during the pre-Revolutionary period on observance of regular legal order. The requirement that government function in accordance with law is, in itself, ample basis for understanding the stress given these words. A commitment to legality is at the heart of all advanced legal systems, and the Due Process Clause often thought to embody that commitment.

The clause also promises that before depriving a citizen of life, liberty or property, government must follow fair procedures. Thus, it is not always enough for the government just to act in accordance with whatever law there may happen to be. Citizens may also be entitled to have the government observe or offer fair procedures, whether or not those procedures have been provided for in the law on the basis of which it is acting. Action denying the process that is "due" would be unconstitutional. Suppose, for example, state law gives students a right to a public education, but doesn't say anything about discipline. Before the state could take that right away from a student, by expelling her for misbehavior, it would have to provide fair procedures, i.e. "due process."

How can we know whether process is due (what counts as a "deprivation" of "life, liberty or property"), when it is due, and what procedures have to be followed (what process is "due" in those cases)? If "due process" refers chiefly to procedural subjects, it says very little about these questions. Courts unwilling to accept legislative judgments have to find answers somewhere else. The Supreme Court's struggles over how to find these answers echo its interpretational controversies over the years, and reflect the changes in the general nature of the relationship between citizens and government.

In the Nineteenth Century government was relatively simple, and its actions relatively limited. Most of the time it sought to deprive its citizens of life, liberty or property it did so through criminal law, for which the Bill of Rights explicitly stated quite a few procedures that had to be followed (like the right to a jury trial) — rights that were well understood by lawyers and courts operating in the long traditions of English common law. Occasionally it might act in other ways, for example in assessing taxes. In Bi-Metallic Investment Co. v. State Board of Equalization (1915), the Supreme Court held that only politics (the citizen's "power, immediate or remote, over those who make the rule") controlled the state's action setting the level of taxes; but if the dispute was about a taxpayer's individual liability, not a general question, the taxpayer had a right to some kind of a hearing ("the right to support his allegations by arguments however brief and, if need be, by proof however informal"). This left the state a lot of room to say what procedures it would provide, but did not permit it to deny them altogether.

## Distinguishing Due Process

*Bi-Metallic* established one important distinction: the Constitution does not require "due process" for establishing laws; the provision applies when the state acts against individuals "in each case upon individual grounds" — when some characteristic unique to the citizen is involved. Of course there may be a lot of citizens affected; the issue is whether assessing the effect depends "in each case upon individual grounds." Thus, the due process clause doesn't govern how a state sets the rules for student discipline in its high schools; but it does govern how that state applies those rules to individual students who are thought to have violated them —

even if in some cases (say, cheating on a state-wide examination) a large number of students were allegedly involved.

Even when an individual is unmistakably acted against on individual grounds, there can be a question whether the state has "deprive[d]" her of "life, liberty or property." The first thing to notice here is that there must be state action. Accordingly, the Due Process Clause would not apply to a private school taking discipline against one of its students (although that school will probably want to follow similar principles for other reasons).

Whether state action against an individual was a deprivation of life, liberty or property was initially resolved by a distinction between "rights" and "privileges." Process was due if rights were involved, but the state could act as it pleased in relation to privileges. But as modern society developed, it became harder to tell the two apart (ex: whether driver's licenses, government jobs, and welfare enrollment  are "rights" or a "privilege." An initial reaction to the increasing dependence of citizens on their government was to look at the seriousness of the impact of government action on an individual, without asking about the nature of the relationship affected. Process was due before the government could take an action that affected a citizen in a grave way.

In the early 1970s, however, many scholars accepted that "life, liberty or property" was directly affected by state action, and wanted these concepts to be broadly interpreted. Two Supreme Court cases involved teachers at state colleges whose contracts of employment had not been renewed as they expected, because of some political positions they had taken. Were they entitled to a hearing before they could be treated in this way? Previously, a state job was a "privilege" and the answer to this question was an emphatic "No!" Now, the Court decided that whether either of the two teachers had "property" would depend in each instance on whether persons in their position, under state law, held some form of tenure. One teacher had just been on a short term contract; because he served "at will" — without any state law claim or expectation to continuation — he had no "entitlement" once his contract expired. The other teacher worked under a longer-term arrangement that school officials seemed to have encouraged him to regard as a continuing one. This could create an "entitlement," the Court said; the expectation need not be based on a statute, and an established custom of treating instructors who had taught for X years as having tenure could be shown. While, thus, some law-based relationship or expectation of continuation had to be shown before a federal court would say that process was "due," constitutional "property" was no longer just what the common law called "property"; it now included any legal relationship with the state that state law regarded as in some sense an "entitlement" of the citizen. Licenses, government jobs protected by civil service, or places on the welfare rolls were all defined by state laws as relations the citizen was entitled to keep until there was some reason to take them away, and therefore process was due before they could be taken away. This restated the formal "right/privilege" idea, but did so in a way that recognized the new dependency of citizens on relations with government, the "new property" as one scholar influentially called it.

**When process is due**

In its early decisions, the Supreme Court seemed to indicate that when only property rights were at stake (and particularly if there was some demonstrable urgency for public action) necessary hearings could be postponed to follow provisional, even irreversible, government action. This presumption changed in 1970 with the decision in *Goldberg v. Kelly*, a case arising out of a state-administered welfare program. The Court found that before a state terminates a welfare recipient's benefits, the state must provide a full hearing before a hearing officer, finding that the Due Process Clause required such a hearing.

## What procedures are due

Just as cases have interpreted when to apply due process, others have determined the sorts of procedures which are constitutionally due. This is a question that has to be answered for criminal trials (where the Bill of Rights provides many explicit answers), for civil trials (where the long history of English practice provides some landmarks), and for administrative proceedings, which did not appear on the legal landscape until a century or so after the Due Process Clause was first adopted. Because there are the fewest landmarks, the administrative cases present the hardest issues, and these are the ones we will discuss.

The *Goldberg* Court answered this question by holding that the state must provide a hearing before an impartial judicial officer, the right to an attorney's help, the right to present evidence and argument orally, the chance to examine all materials that would be relied on or to confront and cross-examine adverse witnesses, or a decision limited to the record thus made and explained in an opinion. The Court's basis for this elaborate holding seems to have some roots in the incorporation doctrine.

Many argued that the *Goldberg* standards were too broad, and in subsequent years, the Supreme Court adopted a more discriminating approach. Process was "due" to the student suspended for ten days, as to the doctor deprived of his license to practice medicine or the person accused of being a security risk; yet the difference in seriousness of the outcomes, of the charges, and of the institutions involved made it clear there could be no list of procedures that were always "due." What the Constitution required would inevitably be dependent on the situation. What process is "due" is a question to which there cannot be a single answer.

A successor case to Goldberg, *Mathews v. Eldridge*, tried instead to define a method by which due process questions could be successfully presented by lawyers and answered by courts. The approach it defined has remained the Court's preferred method for resolving questions over what process is due. *Mathews* attempted to define how judges should ask about constitutionally required procedures. The Court said three factors had to be analyzed:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Using these factors, the Court first found the private interest here less significant than in Goldberg. A person who is arguably disabled but provisionally denied disability benefits, it said, is more likely to be able to find other "potential sources of temporary income" than a person who is arguably impoverished but provisionally denied welfare assistance. Respecting the second, it found the risk of error in using written procedures for the initial judgment to be low, and unlikely to be significantly reduced by adding oral or confrontational procedures of the Goldberg variety. It reasoned that disputes over eligibility for disability insurance typically concern one's medical condition, which could be decided, at least provisionally, on the basis of documentary submissions; it was impressed that Eldridge had full access to the agency's files, and the opportunity to submit in writing any further material he wished. Finally, the Court now attached more importance than the *Goldberg* Court had to the government's claims for efficiency. In particular, the Court assumed (as the *Goldberg* Court had not) that "resources available for any particular program of social welfare are not unlimited." Thus additional administrative costs for suspension hearings and payments while those hearings were awaiting resolution to persons ultimately found undeserving of benefits would subtract from the amounts available to pay benefits for those undoubtedly eligible to participate in the program. The Court also gave some weight to the "good-faith judgments" of the plan administrators what appropriate consideration of the claims of applicants would entail.

*Matthews* thus reorients the inquiry in a number of important respects. First, it emphasizes the variability of procedural requirements. Rather than create a standard list of procedures that constitute the procedure that is "due," the opinion emphasizes that each setting or program invites its own assessment. About the only general statement that can be made is that persons holding interests protected by the due process clause are entitled to "some kind of hearing." Just what the elements of that hearing might be, however, depends on the concrete circumstances of the particular program at issue. Second, that assessment is to be made concretely and holistically. It is not a matter of approving this or that particular element of a procedural matrix in isolation, but of assessing the suitability of the ensemble in context.

Third, and particularly important in its implications for litigation seeking procedural change, the assessment is to be made at the level of program operation, rather than in terms of the particular needs of the particular litigants involved in the matter before the Court. Cases that are pressed to appellate courts often are characterized by individual facts that make an unusually strong appeal for proceduralization. Indeed, one can often say that they are chosen for that appeal by the lawyers, when the lawsuit is supported by one of the many American organizations that seeks to use the courts to help establish their view of sound social policy. Finally, and to similar effect, the second of the stated tests places on the party challenging the existing procedures the burden not only of demonstrating their insufficiency, but also of showing that some specific substitute or additional procedure will work a concrete improvement justifying its additional cost. Thus, it is inadequate merely to criticize. The litigant claiming procedural insufficiency must be prepared with a substitute program that can itself be justified.

The Mathews approach is most successful when it is viewed as a set of instructions to attorneys involved in litigation concerning procedural issues. Attorneys now know how to make a persuasive showing on a procedural "due process" claim, and the probable effect of the approach is to discourage litigation drawing its motive force from the narrow (even if compelling)

circumstances of a particular individual's position. The hard problem for the courts in the Mathews approach, which may be unavoidable, is suggested by the absence of fixed doctrine about the content of "due process" and by the very breadth of the inquiry required to establish its demands in a particular context. A judge has few reference points to begin with, and must decide on the basis of considerations (such as the nature of a government program or the probable impact of a procedural requirement) that are very hard to develop in a trial.

While there is no definitive list of the "required procedures" that due process requires, Judge Henry Friendly generated a list that remains highly influential, as to both content and relative priority:

1. An unbiased tribunal.
2. Notice of the proposed action and the grounds asserted for it.
3. Opportunity to present reasons why the proposed action should not be taken.
4. The right to present evidence, including the right to call witnesses.
5. The right to know opposing evidence.
6. The right to cross-examine adverse witnesses.
7. A decision based exclusively on the evidence presented.
8. Opportunity to be represented by counsel.
9. Requirement that the tribunal prepare a record of the evidence presented.
10. Requirement that the tribunal prepare written findings of fact and reasons for its decision.

This is not a list of procedures which are required to prove due process, but rather a list of the kinds of procedures that might be claimed in a "due process" argument, roughly in order of their perceived importance.

Substantive Due Process



Right of Privacy: Personal Autonomy

Territorial Jurisdiction

Equal Protection

Plessy v. Ferguson (1896)

Plyer v. Doe (1982)

**Section 4.**

Debt

**Section 5.**

Enforcement Power

Commerce Clause

‹ 13th Amendment <u>up</u> 15th Amendment

# Commerce Clause

## Primary tabs

## Overview

The Commerce Clause refers to <u>Article 1, Section 8, Clause 3 of the U.S. Constitution</u>, which gives Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.

Congress has often used the Commerce Clause to justify exercising legislative power over the activities of states and their citizens, leading to significant and ongoing controversy regarding the balance of power between the federal government and the states. The Commerce Clause has historically been viewed as both a grant of congressional authority and as a restriction on the regulatory authority of the States.

## "Dormant" Commerce Clause

The "Dormant Commerce Clause" refers to the prohibition, implicit in the Commerce Clause, against states passing legislation that discriminates against or excessively burdens interstate commerce. Of particular importance here, is the prevention of protectionist state policies that favor state citizens or businesses at the expense of non-citizens conducting business within that state. In <u>*West Lynn Creamery Inc. v. Healy*, 512 U.S. 186 (1994)</u>, the Supreme Court struck down a Massachusetts state tax on milk products, as the tax impeded interstate commercial activity by discriminating against non-Massachusetts

## The Meaning Of "Commerce"

### Origin

The meaning of the word "commerce" is a source of controversy, as the Constitution does not explicitly define the word. Some argue that it refers simply to trade or exchange, while others claim that the <u>Framers of the Constitution</u> intended to describe more broadly commercial and social intercourse between citizens of different states. Thus, the interpretation of "commerce" affects the appropriate dividing line between federal and state power. Moreover, what constitutes "interstate" commercial activity has also been subject to consistent debate.

### Broad Interpretation

In *Gibbons v. Ogden*, 22 U.S. 1 (1824), the Supreme Court held that intrastate activity could be regulated under the Commerce Clause, provided that the activity is part of a larger interstate commercial scheme. In *Swift and Company v. United States*, 196 U.S. 375 (1905), the Supreme Court held that Congress had the authority to regulate local commerce, as long as that activity could become part of a continuous "current" of commerce that involved the interstate movement of goods and services.

From about 1905 until about 1937, the Supreme Court used a narrow version of the Commerce Clause. However, beginning with NLRB v. Jones & Laughlin Steel Corp, 301 U.S. 1 (1937), the Court recognized broader grounds upon which the Commerce Clause could be used to regulate state activity. Most importantly, the Supreme Court held that activity was commerce if it had a "substantial economic effect" on interstate commerce or if the "cumulative effect" of one act could have an effect on such commerce. Decisions such as *NLRB v. Jones*, *United States v. Darby*, 312 U.S. 100 (1941) and *Wickard v. Filburn*, 317 U.S. 111 (1942) demonstrated the Court's willingness to give an unequivocally broad interpretation of the Commerce Clause. Recognizing the development of a dynamic and integrated national economy, the Court employed a broad interpretation of the Commerce Clause, reasoning that even local activity will likely affect the larger interstate commercial economic scheme.

## Shift To A Stricter Interpretation

From the *NLRB* decision in 1937 until 1995, the Supreme Court did not invalidate a single law on the basis of the Commerce Clause. In 1995, the Supreme Court attempted to curtail Congress's broad legislative mandate under the Commerce Clause by returning to a more conservative interpretation of the clause in *United States v. Lopez*, 514 U.S. 549 (1995). In *Lopez*, the defendant in this case was charged with carrying a handgun to school in violation of the federal Gun Free School Zones Act of 1990. The defendant argued that the federal government had no authority to regulate firearms in local schools, while the government claimed that this fell under the Commerce Clause, arguing that possession of a firearm in a school zone would lead to violent crime, thereby affecting general economic conditions. The Supreme Court rejected the government's argument, holding that Congress only has the power to regulate the channels of commerce, the instrumentalities of commerce, and action that substantially affects interstate commerce. The Court declined to further expand the Commerce Clause, writing that "[t]o do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to do."

In *Gonzales v. Raich*, 545 U.S. 1 (2005), however, the Court did return to its more liberal construction of the Commerce Clause in relation to intrastate production. In *Gonzales*, the Court upheld federal regulation of intrastate marijuana production.

Recently, the Supreme Court addressed the Commerce Clause in *NFIB v. Sebelius*, 567 US. 519 (2012). In *Sebelius*, the Court addressed the individual mandate in the Affordable Care Act (AFA), which sought to require uninsured individuals to secure health insurance in an attempt to stabilize the health insurance market. Focusing on *Lopez*'s requirement that Congress regulate only commercial *activity*, the Court held that the individual mandate could not be enacted under

the Commerce Clause. The Court stated that requiring the purchase of health insurance under the AFA was not the regulation of commercial activity so much as *inactivity* and was, accordingly, impermissible under the Commerce Clause.

# Further Reading

For more on the Commerce Clause, see this University of Florida Law Review article, this Virginia Law Review article, and this Stanford Law Review article.

| Official Primary Election Ballot August 23, 2022 Democratic Party Miami-Dade County, Florida | Boleta Oficial de las Elecciones Primarias 23 de agosto del 2022 Partido Demócrata Condado de Miami-Dade, Florida | Bilten Vòt Ofisyèl Eleksyon Primè 23 dawout 2022 Pati Demokrat Konte Miami-Dade, Florid |
|---|---|---|

## PRECINCT 300.0

- **Instructions:** To vote, fill in the oval completely ⬤ next to your choice. Use only a black or blue pen.
- If you make a mistake, ask for a new ballot. Do not cross out or your vote may not count.

- **Instrucciones:** Para votar, rellene completamente el óvalo ⬤ ubicado junto a su selección. Utilice solo un bolígrafo de tinta negra o azul.
- Si comete un error, solicite una nueva boleta. No haga tachaduras o es posible que no se cuente su voto.

- **Enstriksyon:** Pou vote, ranpli oval la okonplè ⬤ akote chwa w fè a. Itilize sèlman plim nwa oswa ble.
- Si w fè yon erè, mande yon nouvo bilten vòt. Pa bife erè a sinon vòt ou a ka pa konte.

Page 1 of 1

**1342-1**

---

**United States Senator**
**Senador de los Estados Unidos**
**Senatè Etazini**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | | |
|---|---|---|
| ○ Ricardo De La Fuente | DEM | 10 |
| ○ Val Demings | DEM | 11 |
| ○ Brian Rush | DEM | 12 |
| ○ William Sanchez | DEM | 13 |

**Governor and Lieutenant Governor**
**Gobernador y Vicegobernador**
**Gouvènè ak Gouvènè Adjwen**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | | |
|---|---|---|
| ○ Charlie Crist | DEM | 35 |
| ○ Cadance Daniel | DEM | 36 |
| ○ Nicole "Nikki" Fried | DEM | 37 |
| ○ Robert L. Willis | DEM | 38 |

**Attorney General**
**Fiscal General**
**Pwokirè Jeneral**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | | |
|---|---|---|
| ○ Aramis Ayala | DEM | 40 |
| ○ Jim Lewis | DEM | 41 |
| ○ Daniel Uhlfelder | DEM | 42 |

**Commissioner of Agriculture**
**Comisionado de Agricultura**
**Komisè Agrikilti**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | | |
|---|---|---|
| ○ Naomi Esther Blemur | DEM | 45 |
| ○ J. R. Gaillot | DEM | 46 |
| ○ Ryan Morales | DEM | 47 |

---

**Circuit Judge, 11th Judicial Circuit Group 52**
**Juez de Circuito, 11no Circuito Judicial Grupo 52**
**Jij Sikui, 11yèm Sikui Jidisyè Gwoup 52**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | |
|---|---|
| ○ Jason Edward Bloch | 96 |
| ○ Oscar Rodriguez-Fonts | 97 |

**County Judge, Group 5**
**Juez del Condado, Grupo 5**
**Jij Konte, Gwoup 5**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | |
|---|---|
| ○ Renier Diaz de la Portilla | 98 |
| ○ Fred Seraphin | 99 |

**County Judge, Group 19**
**Juez del Condado, Grupo 19**
**Jij Konte, Gwoup 19**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | |
|---|---|
| ○ Lissette De La Rosa | 100 |
| ○ Jeffrey Kolokoff | 101 |

**County Judge, Group 42**
**Juez del Condado, Grupo 42**
**Jij Konte, Gwoup 42**

(Vote for 1 / Vote por 1 / Votes pou 1)

| | |
|---|---|
| ○ Alicia Garcia Priovolos | 102 |
| ○ Scott Janowitz | 103 |

**School Board Member District 4**
**Miembro de la Junta Escolar Distrito 4**
**Manm Konsey Eskolè Distrik 4**

(Vote for 1 / Vote por 1 / Vote pou 1)

**Circuit Judge, 11th Judicial Circuit Group 3**
**Juez de Circuito, 11no Circuito Judicial Grupo 3**
**Jij Sikui, 11yèm Sikui Jidisyè Gwoup 3**
(Vote for 1 / Vote por 1 / Vote pou 1)

| | | |
|---|---|---|
| ○ | Teressa Maria Cervera | 90 |
| ○ | Lody Jean | 91 |

**Circuit Judge, 11th Judicial Circuit Group 20**
**Juez de Circuito, 11no Circuito Judicial Grupo 20**
**Jij Sikui, 11yèm Sikui Jidisyè Gwoup 20**
(Vote for 1 / Vote por 1 / Vote pou 1)

| | | |
|---|---|---|
| ○ | Brenda Guerrero | 92 |
| ○ | Robert Watson | 93 |

**Circuit Judge, 11th Judicial Circuit Group 34**
**Juez de Circuito, 11no Circuito Judicial Grupo 34**
**Jij Sikui, 11yèm Sikui Jidisyè Gwoup 34**
(Vote for 1 / Vote por 1 / Vote pou 1)

| | | |
|---|---|---|
| ○ | Mark Blumstein | 94 |
| ○ | Ariel Rodriguez | 95 |

61

| | | |
|---|---|---|
| ○ | Roberto J. Alonso | 130 |
| ○ | Maribel Balbin | 131 |
| ○ | Kevin Menendez Macki | 132 |







7021 0950 0000 0374 7672



Dr. Randy Zapata, ProSe-PA JD
6905 N W 173rd Drive St: O205
Hialeah, Florida 33015
God Is With US As Our Protector

Federal Courthouse
299 EAST BROWARD BLVD
FORT Lauderdale, Florida
Federal building
ATTN: Federal Clerk Court